IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **INDICTMENT** |
| | ) | |
| Plaintiff, | ) | **1:13CR298** |
| | ) | |
| v. | ) | CASE NO. |
| | ) | |
| WILLIAM D. MONTAGUE, | ) | Title 18, United States Code Sections 2, 201, |
| | ) | 205, 207, 208, 1001, 1341, 1343, 1349 & |
| | ) | 1957 and 41 U.S.C. § 2101, 2102 and 2105. |
| Defendant. | ) | |

*FILED*
2013 JUN 19 AM 9:43
*JUDGE DOWD*

The Grand Jury charges:

**General Allegations Related to the VA Development Project**

At all times relevant herein:

1.      The United States Department of Veterans Affairs ("VA") is an agency of the

United States Government, which administered a variety of benefits and services that provided

financial and other forms of assistance to service-members, veterans, their dependants and

survivors.  The VA operated the nation's largest integrated health care system, with more than

1,700 hospitals, clinics, community living centers, domiciliaries, readjustment counseling

centers, and other facilities.

2.      The VA administered health benefits by region, dividing the country among

approximately 23 Veterans Integrated Service Networks ("VISN").  VISN 10 served most of

Ohio.

3.      The Louis Stokes Cleveland VA Medical Center ("Cleveland VAMC") was

approximately the fifth largest VAMC in the country, serving approximately 95,000 veterans

1

annually.  The Cleveland VAMC offered a full range of primary, secondary and tertiary care services to an eligible veteran population covering approximately 24 counties in Northeast Ohio.

4.　　On or about September 2, 1975, WILLIAM D. MONTAGUE ("MONTAGUE") began working for the VA, and he worked in various roles throughout his career.  From on or about August 20, 1995 through his retirement on or about February 3, 2010, MONTAGUE was the Cleveland VAMC Director, a career Senior Executive Service position.  MONTAGUE had responsibility for executive-level management of two facilities that comprised the VAMC and several outpatient clinics.

5.　　MONTAGUE received training and education on the rules and regulations related to Government employees having any additional employment and participating in outside activities.

6.　　The VA had been operating medical facilities in both Brecksville, Ohio, and the Wade Park neighborhood of Cleveland, Ohio.  In or around the early 2000s, the VA began exploring the feasibility of consolidating the Brecksville and Wade Park facilities into one location (hereinafter "VA Development Project").  The combined facility would include a domiciliary, office space, and parking.

7.　　As part of the VA Development Project, the VA contemplated using an enhanced use lease ("EUL"), which was a method of funding construction or renovations on federal property by allowing a private developer to lease underutilized property, with the developer paying rent in cash or in-kind.  The VA selected Business 42 to develop and manage the VA Development Project.

8.　　Michael Forlani ("Forlani") was the sole member of Business 42.  In addition to

2

serving in that role, Forlani had various business interests, including president and part-owner of Northeast Ohio Electric LLC dba Doan Pyramid LLC ("Doan") and a member of the Board of Managers for Veterans Development Domiciliary, LLC. The various businesses in which Forlani had a financial interest worked together on projects and assisted each other in obtaining and performing work.

9.     Business Executive or Employee 52 ("BE52") was employed by Doan and later, Business 66, and helped Forlani on the VA Development Project.

10.     In or around 2007, the VA was considering which components would lease office space within the VA Development Project. The Cleveland VAMC was one component that would move into the office space. MONTAGUE worked to have other VA components commit to leasing office space within the VA Development Project, including Employee Education Services Group ("EES"), Office of Information and Technology ("OI&T"), and Regional Counsel. The VA had guidelines, rules and procedures that governed the other VA components' procurement of office space. The procedures included the VA identifying potential cities or suburbs in which to locate the office space and thereafter soliciting proposals from potential landlords within that geographic region. The VA began the process of soliciting potential landlords. The VA received proposals from Business 67 and Business 42.

11.     In and around 2008, Forlani was experiencing difficulty obtaining financing for the VA Development Project. Forlani sought and received assistance from several people, including public officials, to help him obtain financing. Forlani bribed several public officials in return for their assistance on the VA Development Project.

12.     On July 28, 2008, federal agents, as part of a wide-ranging criminal investigation

3

of public corruption, executed search warrants at the homes and offices of County officials and

contractors, including Forlani's office.  The search warrant called for records related to the VA

Development Project.  Forlani and Doan received federal grand jury subpoenas requiring

production of all documents related to the VA Development Project.

13.     VA Employee 2 worked for the VA and had responsibility for assisting the VA

departments lease office space.

14.     VA Employee 9 was a high ranking VA employee who reported to MONTAGUE.

15.     VA Employee 11 was a VA employee who worked in the Office of Asset

Management in Washington, D.C.

The Grand Jury Further Charges:

## COUNT 1
(Conspiracy to Commit Mail and Wire Fraud and Honest Services Mail & Wire Fraud,
18 U.S.C. §§ 1341, 1343 and 1346, in violation of 18 U.S.C. § 1349 )

16.     Paragraphs 1-15 of this Indictment are re-alleged and incorporated by reference as

if fully set forth herein.

## THE CONSPIRACY

17.     From in or around 2007 through on or about May 31, 2012, the exact dates being

unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere,

Defendant WILLIAM D. MONTAGUE, and Michael Forlani (not charged herein), and others

known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire,

confederate and agree with each other to commit offenses against the United States; that is, to

knowingly devise and intend to devise a scheme and artifice:

(1) to defraud and deprive the VA of its right to the honest and faithful services of

MONTAGUE, through bribery and kickbacks and the concealment of material information related thereto, and

(2) to defraud the VA and other potential VA contractors, including Business 67, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, (1) to cause matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346 and (2) to cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

## OBJECT OF THE CONSPIRACY

18.    It was the object of the conspiracy that MONTAGUE secretly used his official position to enrich himself, his designees (including House of Montague), Forlani, and Forlani's designees (including Business 42 and Business 66), by soliciting and accepting gifts, payments, and other things of value from Forlani and Business 66, in exchange for favorable official action, and that Forlani and his designees enriched themselves by secretly obtaining favorable official action for themselves through corrupt means.

## MANNER AND MEANS

It was part of the conspiracy that:

19.    MONTAGUE solicited and accepted gifts, payments, and other things of value from Forlani and Business 66, including a consulting contract between Business 66 and House of Montague.

5

20.     MONTAGUE provided favorable official action for the benefit of Forlani and his designees, including Business 42 and Business 66 both as requested and as future opportunities arose.

21.     The conspirators took steps to hide, conceal, and cover up their activity and the nature and scope of Forlani's dealings with MONTAGUE.

22.     MONTAGUE gave and offered to give Forlani information related to the VA contracts and projects, which would benefit Forlani and his designees.

23.     MONTAGUE took steps to give Forlani and his designees an advantage in obtaining VA contracts and projects over Forlani's competitors.

24.     In or around 2007, the VA was considering which components would lease office space within the VA Development Project. The VA Medical Center was one component that would move into the office space. MONTAGUE worked to have other VA components commit to leasing office space within the VA Development Project, including EES, OI&T, and Regional Counsel. The VA had guidelines, rules and procedures that governed the other VA components' procurement of office space. The procedures included the VA identifying potential cities or suburbs and thereafter, soliciting proposals from potential landlords. MONTAGUE used his power to try and steer the leases to benefit Forlani.

Acts in furtherance of the conspiracy

25.     In or around 2007, MONTAGUE asked a VA attorney to authorize approval of a proposed lease for office space between the VA and Business 42. When VA attorneys told MONTAGUE that they could not approve the lease because it was an anticipatory lease, MONTAGUE told the VA attorneys that Forlani had been unable to secure financing for the VA

6

Development Project, and the anticipatory lease agreement would likely allow Business 42 to secure the necessary financing because it would show potential investors an income stream.

26.     MONTAGUE continued to pursue the Business 42 lease.  When a VA attorney confronted MONTAGUE about its impropriety, MONTAGUE stated that Forlani needed to obtain financing and the anticipatory lease would help Forlani demonstrate an income stream. MONTAGUE told the attorney that a particular VA department could withdraw from the lease later, after Forlani secured the financing.

27.     When the initial VA lease contained a two-year term, the VA's standard lease term, Forlani enlisted MONTAGUE's assistance to secure a longer lease, which would help Forlani finance the VA Development Project by demonstrating a greater income stream.

28.     On or about January 10, 2008, in response to questions about whether the OI&T and EES would move to the VA Development Project, MONTAGUE explained, "The EUL project will be priced into the Bond Markets on February 1, 2008.  In order to get an AAA insured bond rating, the administrative building has to be 100% leased."  MONTAGUE further explained, "If the developer for the EUL wins the contract, the building will be seven stories.  If the developer does not win the contract, the building will be six stories and the price per square foot will increase.  The medical center understands that either scenario is possible."

29.     On or about March 19, 2008, MONTAGUE and Forlani had a conversation in which MONTAGUE asked Forlani for "your version" of the VA Development Project status. Forlani told MONTAGUE that he was pursuing a bond rating from S&P, but was experiencing delays.  MONTAGUE asked Forlani, "Do you want some good news, even though it's small potatoes?"  Forlani replied, "Yes, anything is good."  MONTAGUE said, "Alright, (UI) I may

7

have found some more tenants for your building in front of the garage . . . Ah, about 75 more

employees." MONTAGUE continued, "Yeah, ah, [a VA department] is growing ... and

apparently now, the EES is growing too. . . So ... and ... I got the guy from the national energy

center here, and he's growing too but he's, he's not growing as much." Forlani responded, "Ok."

     30.    Later in the conversation, Forlani told MONTAGUE, "I'll stay in touch, thank

you. And I'm hearing again not to ah, it would certainly help the S&P's condition if we had the

one 11,000 square foot lease and I know, I think we're waiting for (UI) or [VA Employee 2] to

get her authority back or whatever (UI) you call it." MONTAGUE said, "It's in the mail ... so

we should be able to get that signed." Forlani said, "Ok ... I'll just, again, that would close any

loophole that there would be in regards to the S&P. I mean because they could see another

stream of money to cover the equity portion I have in there. It would only just enhance it."

MONTAGUE told Forlani, "We'll get it signed."

     31.    On or about March 31, 2008 at approximately 12:19 p.m., Forlani learned about a

potential contract for laundry services at the VA from a contractor, Business Executive or

Employee 70 ("BE70"), which would involve a design build job for Forlani's company. Forlani

said, "Ok, I see MONTAGUE tomorrow so I'll ask him."

     32.    On or about March 31, 2008 at approximately 1:23 p.m., MONTAGUE and

Forlani had a conversation in which Forlani told MONTAGUE, "BILL, there is something I

think that maybe can be done to help the process." MONTAGUE asked, "And that would be?"

Forlani explained, "Um, Standard and Poors, um, is the rating agency. They've had this deal in

front of them for like six weeks. So let me give you my business logic of what's going on.

Standard and Poors has a lot of repetitive annuity type clients that need, because of the conditions

of the marketplace, probably they're inundated with having to re-rate existing situations.  And

since we're a one time deal, they are probably just keep shoving our shit to the bottom of the pile.

For a lack of a better, you know, let's look at this from a standpoint of layman's terms.  I'm

wondering if the government, somebody, um, would have some influence with S&P to ask them

to move, you know, to quicken the process.  'Cause there's, it never takes this long, BILL."

MONTAGUE replied, "Well, I, I would imagine, ah, I, you know, I would imagine that if

government business could be framed as an annuity, how would we do that?  I mean we would

have to get somebody else to do it.  But I mean, that's the goal right, is to. . . ."  Forlani

explained, "Right, somebody in the system might be able to ah, you know, maybe it's [a private

business], I doubt it but, you know, somebody at the VA, like um, the head of the VA could say,

the government, ah, provides a lot of opportunities for S&P, we need and understand where the

status of this, ah, this one is and like, you know, like to see if it can come out quicker."

MONTAGUE told Forlani, "Hmm, it ah . . . let me search around and see if I can figure out who

that guy is."  Forlani told MONTAGUE he would bring the telephone number for the S&P

analyst the following morning.  MONTAGUE said, "Yeah, I sure as hell ain't gonna have it

before tomorrow morning.  So yeah, but I'll ah, how dare them trifle with us, don't they know

we're Mikey and BILLY."

      33.    MONTAGUE changed topics and said, "Now, after this is done tomorrow are you

going to be in a frame of mind to talk about some, I, I've got a couple, ah, I'll give you three

projects that are design build that you probably need to know about now.  I mean, you've, you've

heard about them (UI) it's getting to the point where somebody's, you're going to have to tell

someone to pay attention.  I don't know if it's [] or who you tell to pay attention but. . . . "

Forlani responded, "Yeah, sure, we'll discuss that and I hopefully can keep my head screwed on straight." MONTAGUE promised Forlani, "Alright well I will think, ah, and I'll do a little scraping around and see if we got any leverage as an agency," to which Forlani responded, "Yeah, that's all I want you to do, BILL. Figure if anybody's got some leverage."

34.     On or about April 2, 2008 at approximately 2:03 p.m., MONTAGUE and Forlani had a conversation in which Forlani asked MONTAGUE, "Is there, BILL, do you have some need to, like work with UH and potentially somebody else to, to take your laundry services off site, or subcontract them out?" MONTAGUE said, "When we close, when we close Brecksville we will have to contract out our laundry services." Forlani told MONTAGUE that Forlani was going to a meeting the following day, to which MONTAGUE responded, "Alright well you may be getting the laundry . . . I get, I get credit (laughing)."

35.     On or about April 5, 2008, MONTAGUE and Forlani had a conversation in which Forlani told MONTAGUE, "When somebody went at FED BIZOPS, it looked like the Chillicothe and Erie jobs were requesting design only, but maybe they don't know what they're looking at. Are, and you're pretty sure it's a design build?" MONTAGUE replied, "It's really strange and I don't understand this, Michael. Let's start with Erie, I talked to the chief engineer at Erie and she said it is going to be design build. In Chillicothe, I said, 'It's on the street to hire an architect.' So I personally stopped the director later [and asked], 'I thought you were going to go design build' We are. So I'm wondering if it's almost a semantics thing. The director at one place and the chief engineer at another place both swore to me these things were going to be design build. We'll try to respond and see if we get some clarification." Forlani replied, "I appreciate that." MONTAGUE spoke to Forlani on another topic, stating, "The other thing is if,

um, Cleveland Foundation is kind of getting some hints that the only way they can probably put this laundry deal together is do it as a development deal. . . . So, if you made an off the beat comment that, you know, your experience with doing a development deal rather than them trying to procure it themselves that might help . . . us move that along quicker." MONTAGUE responded, "I can do that in two different venues. Number one, I've got a meeting with [a VA employee]. This is a big general meeting, um, um, this week. I'm going to a reception with him. But the other thing that's even more important is we've, we've got the thing for the Fisher House being considered for one of their grants . . . I will make sure he knows how much I think of you and that we intend for you to be our partner in the Fisher House if the Fisher Foundation doesn't, you know, for some reason, have somebody that we have to use. Or, you know, I'll get it done."

36.    On or about April 10, 2008 at approximately 5:50 p.m., MONTAGUE told Forlani, "The next time you and I see each other I have a list of possible energy projects I'm going to give you that ah, you may want to give to your, the guy that runs your department or something like that. (UI)" Forlani replied, "That would be nice, BILL, yeah. Anything would be nice right now." MONTAGUE said, "Well … maybe, right now if I … I may have to give some money to the energy project (UI). The hospital is, is kind of rolling in dough." Forlani told MONTAGUE, "You know, it's still rough out there buddy. I'm trying, I'm exhausted." MONTAGUE said, "I know you are, but I have a list of potential energy projects, and if you just tell, the guy can tell me which kind you are interested in." Forlani said, "Yeah great."

37.    On or about April 16, 2008 at approximately 5:47 p.m., MONTAGUE and Forlani had a conversation in which MONTAGUE told Forlani, "Question number one or two, the decision as to place for Parma will not be made until July, or June . . . Ok, ah, there is no

favorite, ah, you know, we like [Business 72] but we like Mike Forlani.  We, I mean, if you get

some kind of wind that [Business 72's] got the inside, that is very much not the case."  Forlani

said, "June, BILL, you are saying June.  I'm trying to think about my options, how long they run.

They are going to make a decision in June they're telling you."  MONTAGUE later told Forlani,

"And then item number one, um, I had [VA Employee 9] try to call [], ah, to get a read on ah, to

get a read on [VA Employee 11] and how to (UI) so I can figure out my strategy whether I went

to [VA Employee 11] or I just went straight to [VA Employee 11's] supervisor.  She also

emailed him, he neither called nor emailed her back.  We're going to give him one more try

tomorrow morning and if I don't get him I'll probably just go to [VA Employee 11's] supervisor

because I think I can get better information from him . . . So that's the plan so I didn't ah,

accomplish that one, but we did, we did try."  MONTAGUE also told Forlani, "Um, and then this

is just, just for information.  Um, apparently Tom was at a meeting today where the contracting

Nazis informed him that, um, him and whoever else was there, apparently that all business was

going to go to veteran disowned companies, disabled companies, veteran disabled companies and

he is apparently quite piqued because of course his company is not a veteran disabled company,

it's a you know, it's a minority enterprise . . . So he fired off a bunch of (UI) and stuff like that

which just reminds me to repeat what I told you last night is that, there is nobody better at, at

exploring options to a contractor than I know than [].  Now did you get my message last night as

you were going home?"  Forlani replied, "Yes, yes."  MONTAGUE stated, "I cannot imagine

that ah, with the time that has been taken since you were selected and what's going on in the

country that we cannot package up a commodities, ah, reconsideration, it's just timing becomes

the issue.  So I will see if I can do a little poking around and find out how that might be done."

38.     On or about April 18, 2008 at approximately 3:27 p.m., MONTAGUE and Forlani had a conversation in which Forlani asked, "Ah, you didn't hear from your boy VA Employee 11's supervisor did you?" MONTAGUE replied, "Um, I did not and I just, I just talked to [VA Employee 9]. I have been holding out for [] to call back, he must be on vacation or something. . .. Yeah, I, I'm sorry Michael, you know, I, I keep saying well should I call him this morning, well maybe he'll call [VA Employee 9] so . . . I've been a bad boy."

39.     On or about April 21, 2008 at approximately 5:19 p.m., MONTAGUE left a voice mail message for Forlani, "[VA Employee 11] realizes they're going to be double A bonds so there is no issue. Thanks bye."

40.     On or about April 22, 2008 at approximately 4:33 p.m., Forlani and BE52 discussed a lease cost estimate the VA received from a third party contractor.

41.     On or about April 22, 2008 at approximately 4:20 p.m., Forlani discussed the third party contractor report with VA Employee 9. VA Employee 9 told Forlani, "Mr. MONTAGUE and I were going to talk with him and figure out what the next plan was and who moves forward with [VA Employee 2]. I need to talk to Mr. MONTAGUE about, about who calls tomorrow [UI] and says we got to do something here, because every time we say something they threaten to report us to the IG [Inspector General]." VA Employee 8, who also participated in the conversation, said, "There are two lease proposals, you and another. According to [a third party], both are too high. We will send it back to both offerors and both have a week to respond with a lower quote. So I called [BE52] to see if he received anything yet." Forlani replied, "I guess I got to leave that to you guys. I don't know the procedures." VA Employee 9 told Forlani, "We need to see if there's anything we can do to alter this."

13

42.     On or about April 22, 2008 at approximately 4:54 p.m., MONTAGUE and Forlani discussed the third party lease report.  MONTAGUE said, "I have no doubt, I mean, that you are correct, what I'm trying to figure out is how do we approach this strategically."  MONTAGUE told Forlani, "Let me think this thing through, [VA Employee 9 and VA Employee 8] called me ah, about 15 minutes ago and there's got to be a way to approach this.  This [VA Employee 2] I'm going to take out and shoot when I get a chance."  Forlani said, "I guess they tell me that, every time you guys get a little … you know, she threatens to go to IG and all this other (UI)."  MONTAGUE replied, "Right, we have to be very careful.  So what we're thinking, I'm thinking about doing as a preemptive move and have the lawyers come at her.  Because see what (UI) we'll call the lawyers.  So, if the lawyers are the ones that (UI).  Unfortunately the lawyer I want to deal with isn't here (UI).  By tomorrow morning after we have dazzled our friends from the bond insurance place, we will solve this, we always solve them right Michael."

43.     On or about May 1, 2008 at approximately 11:57 a.m., Forlani asked VA Employee 8 if he had heard anything from VA Employee 2.  VA Employee 8 updated Forlani.  Forlani told VA Employee 8, "Ok, I want to make sure they all understand, you know, the level of security, the level of all of the access to the data network and all the other things that you know are so entwined in here."  VA Employee 8 responded, "No, no, and the other thing and you didn't hear this from me, I guess your bid and the other person's bid was very similar."  Forlani answered, "Uh huh, Ok."  VA Employee 8 continued, "And so like I would say before A, you know, the level of, especially the IT stuff, in our opinion, that offered in this building is far better and that would even go to show me even more that this other person's appraisal, is you know, (UI), if both of your bids were similar, and then this one was quite a bit, I guess the appraisal was

14

quite a bit less, maybe it is something wrong with our [UI]." Forlani asked, "Ok, um and at this stage, that's the only thing holding up 'cause, uh, then you guys would just vote? Or the votes have already . . . ok, ok." VA Employee 8 replied, "Yeah, yeah, we have to wait for that to be done, then we convene a board and then we vote and then we're done." Forlani asked VA Employee 8 to keep him informed, "'cause I got so many moving parts right now and I'm getting pressure from every different angle."

44.     On or about May 5, 2008 at approximately 11:59 a.m., MONTAGUE and Forlani had a conversation in which MONTAGUE told Forlani, "Michael I have good news for you." Forlani stated, "You won the lottery and the super rate, or whatever you call that, the mega..." MONTAGUE said, "Not only did my ticket win, I had put your name on it. The judge signed the order giving us the land on Friday, late Friday afternoon. So we now own the land. The bed tower notice to proceed late this week or early next week. It's a done deal  (UI)  and I think (UI) . . . [VA Employee 8] is sending an email to [BE52] so he can do your (UI) for you but I wanted to tell you personally."

45.     On or about June 2, 2008, at approximately 4:52 p.m., after Forlani had learned about the federal investigation into bribery, fraud and corruption in Cuyahoga County, he told MONTAGUE, "I'm using multiple phones to shield myself from the enemy." MONTAGUE questioned, "And that would be?" Forlani replied, "Everybody." MONTAGUE assured Forlani, "I am not the enemy . . . I am working to achieve our mutual goals." Forlani told MONTAGUE, "I am making some very big in-roads because I've asked our union friends to step in and buy bonds, and it looks like some friends of our from the east are maybe going to do a substantial buy here which will really help our situation. And also buy it at a good rate." MONTAGUE replied,

"Oh, they're going to bid them down. Michael, I, I bask in your aura." Forlani told

MONTAGUE, "One thing, BILL, that I know we are going to need. I had [BE52] email [VA

Employee 8]. Remember the famous MOU of which [VA Employee 11] was a party to, and that

was the staggered accepting, ah, acceptance of a construction contract. Meaning that if the

garage got there before the office building . . . you would accept the project and, you know, we

would pay liquidated damages to provide the parking . . . We need you to get regional counsel,

somebody to write a legal opinion saying it's authority, you know." MONTAGUE asked, "So

what exactly do I need to do? I'm getting pen and paper." Forlani explained, "We just need a

legal opinion that just, ah, lends credence that, ah, you, you know, have the authority to do that."

46.     MONTAGUE then said, "Let me explain what I'm doing on another front. . . .

This is one thing you have to explain to BE52 and your boys that they cannot make a mistake on .

. .We are going to send back to each of the proposed (UI) you know for the leases. How do you

intend to meet the IT expectations. The, you know, the computer stuff . . . [BE52] cannot just

blow this off, he's got to go to your IT types and just nail it. Level three, this, that, I mean you've

got to send me something that talks about IT like you are going to protect it like, ah, the CIA."

Forlani responded, "Got it." MONTAGUE reiterated, "And tell him, no, no half ass . . . you've

got the A team, there's no doubt about it. We gotta use the A team on this one. . . . Because I'm

trying to blow the other guys out of the water."

47.     MONTAGUE turned to another topic. "Number two, um, you and I. Well let me

just tell you up front. You know these contracting people that hate [a company that works with

Forlani's companies] and, ah, have tried to blow them out. Well fortunately they are very lazy

people and, ah, they cannot get their job done so they are subcontracting it to the Corps of

16

Engineers in Buffalo, NY.  And you may have gotten this message already because [VA Employee 9] told it to [BE52] . . . But I think if you have the correct disabled veteran enterprise and, ah, you're willing to work with the Corps of Engineers in Buffalo, NY you may have the key to the mint."  Forlani replied, "Great, ok.  Very good."  MONTAGUE told Forlani, "I'll find out exactly what (UI) in Washington."

48.    On or about June 9, 2008 at approximately 7:05 p.m., Forlani and MONTAGUE discussed an issue related to the VA Development parking garage.  Forlani told MONTAGUE, "Ok, that's your mission."  MONTAGUE said, "Alrighty."  Then Forlani said, "Your mission is VA Employee 11, too, don't forget you got a [VA Employee 11] mission."  MONTAGUE responded, "I know I got a [VA Employee 11] mission but I've been at HB all afternoon, so I did not perform this afternoon.  I'm a bad boy."

49.    On or about June 10, 2008 at approximately 3:51 p.m., MONTAGUE and Forlani had a conversation in which Forlani said, "Uncle BILL," and MONTAGUE replied, "Yes Uncle Mikey.  I have a mixture of news, most of it is very positive."  They first discussed an issue related to a back-up plan if the VA Development Project parking garage was not completed prior to the other buildings.  Then MONTAGUE asked Forlani to clarify Forlani's position as to whether the VA should issue the lease through GSA or request permission to issue the lease directly.  Forlani explained, "Let me say this to you, BILL, it's, it's more desirable for me because there is 10-year financing which makes the financing easier, um, as opposed to ah, adjusting the ah, enhanced use lease this late in the game.  Which would mean that I really don't want go and get any more bond money, which means it would be a little tricky for me to pick up the balance of the money through a loan.  That's why we were talking about that 10-year

provision would be important . . . it would be easier if it was GSA, I would say yes.  But it would

not benefit you as much."  MONTAGUE then updated Forlani about the third party lease report,

stating, "I have an email now from [VA Employee 10] that says we can ignore the appraisals.

Because the guy that did the appraisals wrote right in there that there is no construction in the

University Circle area that meets this criteria.  Therefore you are going to have to build new.  He

put it right in the document.  So that gives us authority to go to scoring."  Forlani replied, "Send

[VA Employee 10] a case of Sam Adams on me."  MONTAGUE said, "This, this, this lady I

mean I'm rapidly falling in love.  I want you to know, I have invested lots of personal shoe

leather walking over there."  Forlani said, "Ok, so when we go to scoring now what's going to

become important is that um … A the other technical requirements," and MONTAGUE

interjected, "Which are IT and Transportation . . .  And we're working on that, I got [VA

Employee 8], that's why I got [VA Employee 8] here, I've got the engineers getting the correct

questions from [VA Employee 9] to ask you.  So you haven't gotten the questions yet, but when

you do A team, ok."  MONTAGUE said, "Alright so I will not approach [VA Employee 11]

other than to change the service agreements if this keeps proceeding down the right road  . . .

Alright, we agree to the strategy?"  Forlani said, "Yes."  MONTAGUE told Forlani, "Alright go

bayonet the wounded."  Forlani asked, "You know BILL, in regard to that, do you want me to

now drop the rate some if it does go GSA?"  MONTAGUE said, "Ah, I want you to play it out

and I don't want to get in the middle of that, that probably certainly wouldn't hurt if you got a

best and final offer request."

      50.    On or about June 11, 2008 at approximately 4:32 p.m., MONTAGUE left a voice

mail message for Forlani, "Michael, it's his eminence, both letters are signed I am told and have

18

been sent, I hope that's true. [VA Employee 8] says [BE52] has sent the changes . . . so that should be done too. So we're on a roll, talk to you when you feel so inclined. Bye."

51.     On or about June 13, 2008 at approximately 2:42 p.m., MONTAGUE and Forlani had a conversation in which Forlani and MONTAGUE discussed an issue related to the VA Development Project parking garage. MONTAGUE said, "I want to make sure I'm being helpful . . . (UI)." Forlani answered, "I'll tell you what would be helpful if you can get the both of them and if you can ask them if they can state the rate at $7 a day per space." Forlani later said, "If you could do that, BILL, that would really help and then I'll tell the guys the other stuff they are asking for they can shove it." MONTAGUE responded, "Alright, let me . . . so you need me to get both Case and, and UCI to modify their letter to say $7 a day. I, I will get to work on that immediately. I don't think I can get it done by the end of the day. I'll have the letter re-written and I'll have it forwarded to each of them and I'll follow up on Monday. Ok."

52.     On or about June 17, 2008, VA Employee 2 sent an email to BE52, seeking additional information about the lease proposals. She received a response on or about June 20, 2008.

53.     On or about June 25, 2008 at approximately 8:34 p.m., Forlani updated MONTAGUE on the status of the VA Development Project financing. MONTAGUE said, "Now, now Michael you understand, I mean, have you ever had a client more on your side than us?" Forlani complained, "And, BILL, I can't tell you how much on the hook I am with construction costs right now, I mean, you know, it's not my fault." MONTAGUE replied, "Michael I know and I will fight on your behalf, I'm as tough as they come." MONTAGUE further said, "Ok, Michael, we will get there, we always win. Correct. And relax, that's an

19

order."

54.    On or about June 26, 2008 at approximately 1:44 p.m., MONTAGUE and Forlani

had a conversation in which MONTAGUE told Forlani, "I just got some good news for both of

us . . . . I'm expecting a call back from [VA Employee 11] momentarily, but I have tried to find

out some information I haven't found anything beyond what you told me. . . ." Forlani

interrupted MONTAGUE and said, "If I can't get this opinion I can't get the optimum and then

just forget it. Without the opinion I can't sell anything. And I just I just want to let you know, I

mean, that's where it's at." MONTAGUE returned to the "good news"  and said, "Can please,

now sit still, the other vendor who's the grocery store on the leases . . . Has stated, he sent back

when he got the IT question, said he had no intention of providing IT services so the likelihood is

is we can disqualify him and move on to just using new construction costs 'cause you're the only

game in town but you gotta get the boys to answer the IT question . . . ." Forlani told

MONTAGUE that he submitted the IT information the prior Friday.  Forlani later said, "The only

problem is, BILL, can you figure out a way to suspend a 7th floor up in the (UI)?"  They both

laughed.

55.    On or about June 26, 2008 at approximately 6:11 p.m., Forlani was complaining

to MONTAGUE about delays in the VA's decision making process.  MONTAGUE said, "Ok, so

my job is to get them to say yea or nay?"  Forlani replied, "Yeah so you know I guess all I can

ask, BILL, is they look at it quickly and say yay or nay.  It's not like it's nuclear science. . .There

is there is no hope for me, BILL, big brother, I love you big brother, but there is no hope for me

right now, I am, I'm beaten senseless.  I'm absolutely insane.  I can't, I'm not going to something

. . . And nothing is going to make me any better right now, unless something. . . ."  MONTAGUE

interrupted, "Uh no no your big brother is going to make you better." Forlani told MONTAGUE, "Try to get [VA Employee 11] to reach . . . Get [VA Employee 11]to react, he can't sit on it."

56. On or about July 1, 2008 at approximately 3:32 p.m., Forlani complained to MONTAGUE that VA Employee 11 had not responded, which was delaying Forlani's S&P rating. MONTAGUE said, "I'm glad you called and I now know my assignment." MONTAGUE promised to contact VA Employee 11 at 8:00 the following morning.

57. On or about July 2, 2008 at approximately 10:16 a.m., MONTAGUE and Forlani had a conversation in which MONTAGUE told Forlani, "I have, I have, spoken to both [VA Employee 13] and [VA Employee 11], um [VA Employee 11] isn't overly sold on this concept but he says if the lawyers say ok it's ok with him and he is expecting, I mean he thinks he's not sure that it indicates, er, he's he's worried that just the words mean separation, but if the lawyers say it doesn't mean separation, it's fine by him they expect an answer back today or by the latest tomorrow." MONTAGUE promised to call Forlani "immediately" after he received the answer.

58. On or about July 2, 2008, the VA sent a letter via Federal Express to Business 67, providing notice that its proposal could not comply with the necessary IT requirements.

59. On or about July 7, 2008, MONTAGUE asked Forlani's assistant, Business Executive or Employee 60 ("BE60"), if Forlani received any news. When the assistant told MONTAGUE that Forlani was in a meeting, MONTAGUE replied, "What I need is my instructions. Have we gotten any place or um he must send me on a quest." MONTAGUE laughed.

60. On July 28, 2008 at approximately 3:45 p.m., while federal agents were still executing a search warrant at Forlani's office, MONTAGUE called Forlani and asked, "Are you

21

alone?" When Forlani replied, "Yes." MONTAGUE told Forlani that the Cleveland Plain

Dealer called the VA and asked questions about Forlani's VA Development Project.

MONTAGUE told Forlani that VA Employee 8 only answered "stuff he had to answer."

61.     On or about September 22, 2008, MONTAGUE formed House of Montague

Wealth Management and Consulting, LLC ("House of Montague") as an Ohio Domestic Limited

Liability Company.

62.     After the search warrants were executed on July 28, 2008, MONTAGUE

continued to lobby within the VA to support the EUL.

63.     On or about April 21, 2009, MONTAGUE attended a meeting with VA officials,

Forlani, potential financing sources and others, regarding the VA Development Project.

MONTAGUE and Forlani each gave presentations on why attendees should finance the project.

64.     On or about June 17, 2009, Business 42 obtained the use of approximately 432

parking spaces at a rate of $7/day, in the event the administration building and domiciliary were

completed prior to the parking garage.

65.     On or about October 28, 2009, the VA and Business 42 executed documents

related to the VA Development Project, all dated October 1, 2009.

66.     On or about January 1, 2010, Business 66 began operations, having purchased

Doan's assets.  Business 66 operated out of Doan's former office space and retained many Doan

employees and management, including BE52.

67.     On or about January 11, 2010, MONTAGUE announced his intent to retire from

the VA effective February 3, 2010.

68.     On or about February 3, 2010, MONTAGUE retired from the VA.

69.     On or about February 15, 2010, Business 66 issued a check to House of Montague for $2,750, the first of many approximately monthly checks.

70.     On or about November 3, 2010, MONTAGUE became a Trustee of the Patricia M. Lawley Trust, which was funded by ninety-nine percent of the units of Conglomerate Holdings Northeast Ohio Electric, LLC.

71.     On or about December 29, 2010, MONTAGUE became a member of the Business 66 Board of Advisors.

72.     From on or about February 15, 2010 through on or about May 2012, Business 66 paid House of Montague $156,750.

EXECUTION OF THE SCHEME

73.     Throughout the conspiracy, MONTAGUE, Forlani and others, for the purpose of executing the above-described scheme and artifice, caused documents to be delivered and sent through the United States mails, and caused interstate wire communications, including interstate telephone calls and email communications. For example, on or about July 2, 2008, the VA sent Business 67 a letter via Federal Express, providing official notification of its elimination from competition, which resulted in Forlani's company remaining as the sole bidder. The March 19, 2008 conversation described in paragraph 29 above between MONTAGUE and Forlani, occurred while MONTAGUE was in Cleveland, Ohio and Forlani was in Florida.

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury Further Charges:

COUNT 2<br>(Bribery of Public Officials, 18 U.S.C. §§ 201(b)(2) & (c)(1)(B) and 2)

74.     Paragraphs 1-12 of this Indictment are re-alleged and incorporated by reference as

23

if fully set forth herein.

75.     From in or around 2007 through on or about the date of this Indictment, the exact

dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and

elsewhere, Defendant WILLIAM D. MONTAGUE, a public official,  (1) directly and indirectly

did corruptly demand, seek, receive, accept, and agree to receive and accept something of value

personally and for another person and entity, in return for being influenced in the performance of

an official act, being influenced to commit and aid in committing and to collude in, and allow,

and to make opportunity for the commission of a fraud on the United States, and being induced

to do an act and omit to do an act in violation of his official duty; and (2) otherwise than as

provided by law for the proper discharge of official duties, directly and indirectly did demand,

seek, receive, accept, and agree to receive and accept something of value personally for and

because of an official act performed and to be performed by MONTAGUE.

All in violation of Title 18, United States Code, Sections 201(b)(2) and (c)(1)(B) and 2.

The Grand Jury further charges:

COUNTS 3-5
(Disclosing Public Contract Information, 41 U.S.C. §§ 2101, 2102 & 2105)

76.     Paragraphs 1-12 of this Indictment is re-alleged and incorporated by reference as

if fully set forth herein.

77.     On or about the dates set forth below, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendant WILLIAM D. MONTAGUE, a person described in §

423(a)(2), did knowingly disclose contractor bid and proposal information and source selection

information, as defined in Title 41 U.S.C. § 2101, before the award of a federal agency

procurement contract to which the information related, in exchange for a thing of value and to

24

obtain and give a person a competitive advantage in the award of a federal agency procurement contract.

| Count | Date | Description |
|-------|------|-------------|
| 3 | June 2, 2008 | MONTAGUE's conversation with Forlani summarized in Count 1. |
| 4 | June 10, 2008 | MONTAGUE's conversation with Forlani summarized in Count 1. |
| 5 | June 26, 2008 | MONTAGUE's conversation with Forlani summarized in Count 1. |

All in violation of Title 41, United States Code, Sections 2101, 2102 and 2105.

**General Allegations Related to MONTAGUE and Business 73**

78.     Business 73 ("Business 73") was a non-profit organization that provided a variety of human service programs to help people in need, including providing social services to veterans.  Business 73 had branches around the United States, including in Cleveland, Ohio, and was headquartered in Virginia.

79.     At all times relevant herein, Business Executive or Employee 69 ("BE69"), was a high-level executive for Business 73.

80.     Business 73 had business with the Cleveland VA, including participating in the VA Homeless Providers Grant and Per Diem Program, through which Business 73 provided transitional housing and training for homeless veterans.  The VA conducted annual site inspections to ensure Business 73 complied with the necessary program requirements.  The VA inspection team completed a VA Form 10-0361c, VA Homeless Providers Grant and Per Diem Program Medical Center Director Review Sheet, which was presented for the Director's signature.  The Director's signature authorized the VA to release funds to pay Business 73 under the program.  The Business 73 and VA also signed a Memorandum of Agreement to work

25

collaboratively to serve mentally ill homeless veterans.

81.    In or around 2007 and 2008, Business 73 determined that some of its branches were struggling. Business 73 considered replicating the successful Business 73 veteran service program at the Cleveland branch at those other branches.

82.    In approximately late 2007, BE69 asked MONTAGUE if he could schedule a meeting with a VA official in Charleston, South Carolina to discuss Business 73 providing services to that facility. MONTAGUE arranged for the meeting. MONTAGUE asked BE69 if Business 73 would pay him for arranging the meeting and any future meetings.

83.    Business 73 considered hiring MONTAGUE as a consultant to help Business 73 expand services provided to the VA. MONTAGUE informed Business 73 that he was about to retire from the VA and expressed interest in helping Business 73 strategically develop joint ventures and/or expand services provided to the VA. MONTAGUE emphasized his ability to access key decision makers in the VA quickly and effectively.

84.    On or about July 1, 2008, MONTAGUE entered into a consulting agreement with Business 73, in which MONTAGUE would receive approximately $2,500 per day, payable in monthly installments of $5,000, for a minimum of 24 days, from on or about July 1, 2008 through on or about July 1, 2009. MONTAGUE would also receive reimbursement for reasonable and necessary expenses.

85.    MONTAGUE did not retire from the VA as represented to Business 73. He remained employed with the VA until on or about February 3, 2010. MONTAGUE told BE69 that MONTAGUE had contacted the VA ethics panel and received authorization to work as a Business 73 consultant, as long as MONTAGUE took vacation time to perform the consulting

work. In fact, MONTAGUE had not received such authorization.

86.     On July 28, 2008, shortly after MONTAGUE signed the consulting contract with Business 73, the FBI executed search warrants at Michael Forlani's office and elsewhere. Although permitted under the contract, MONTAGUE did not bill Business 73 for consulting work at either the end of July 2008 or beginning of August 2008.

The Grand Jury further charges:

## COUNT 6
### (Acts Affecting a Personal Financial Interest, 18 U.S.C. § 208)

87.     Paragraphs 1-5 and 78-86 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

88.     On or about April 24, 2008, the exact date being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant WILLIAM D. MONTAGUE, being an officer and employee of the executive branch of the United States Government and an officer and employee of an independent agency of the United States, knowingly and willfully participated personally and substantially as a Government officer and employee, through a decision, approval, disapproval, recommendation, rendering of advice, investigation and otherwise, in a proceeding, application, request for a ruling and other determination, contract, claim, controversy, charge, and other particular matter in which Defendant and an organization with whom he was negotiating and had any arrangement concerning prospective employment, namely Business 73, had a financial interest.

It was part of the offense that:

89.     On or about January 11, 2008, the VA conducted a periodic inspection at a Business 73 facility related to the VA Homeless Providers Grant and Per Diem Program.

27

90. On or about February 8, 2008, the VA conducted a periodic inspection at a Business 73 facility related to the VA Homeless Providers Grand and Per Diem Program.

91. On or about April 24, 2008, MONTAGUE, as Cleveland VA Director, signed a Form 10-0361c, Medical Center Director Review Sheet, following the February 8, 2008 inspection. MONTAGUE approved placing veterans at the Business 73 facility and re-appointing a project liaison.

All in violation of Title 18, United States Code, Section 208.

The Grand Jury further charges:

COUNT 7
(Activities of Employees in Claims Against and Other Matters Affecting the Government,
18 U.S.C. § 205)

92. Paragraphs 1-5 and 78-86 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

93. In or around 2007, Business 73 was performing work for the Cleveland VA, including participating in the VA Grant and Per Diem Program. Beginning in or around the end of 2007, Business 73 tried to implement programs similar to that in Cleveland in other VA facilities.

94. From on or about July 1, 2008 through on or about July 1, 2009, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant WILLIAM D. MONTAGUE, being an officer and employee of the United States in the executive branch of the Government and in any agency of the United States, other than in the proper discharge of his official duties, did knowingly and willfully act as an agent for anyone before any department and agency in connection with any covered matter in which the

United States was a party and had a direct and substantial interest.

It was part of the offense that:

95.     As part of his consulting contract with Business 73, MONTAGUE helped Business 73 pursue work with the VA in various states, including North Carolina.

96.     MONTAGUE contacted VA officials in various states on behalf of Business 73.

97.     MONTAGUE was successful in scheduling meetings for the Business 73 to present its services to VA officials.

All in violation of Title 18, United States Code, Section 205.

The Grand Jury further charges:

COUNT 8

(Falsify, Conceal, and Cover Up a Material Fact to the United States, 18 U.S.C. § 1001)

98.     Paragraphs 1-5 and 78-86 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

99.     In or around 2008, WILLIAM D. MONTAGUE and Business 73 entered into a consulting agreement that covered the period from on or about July 1, 2008 through on or about July 1, 2009. The agreement provided that Business 73 would pay MONTAGUE approximately $2,500 per day, payable in monthly installments of $5,000, for a minimum of 24 days in the 12 months commencing on or about July 1, 2008. The agreement further provided that MONTAGUE would provide tailored support to affiliates with an interest in developing services for veterans as requested by Business 73.

100.     As a Senior Executive Service employee at the VA in calendar year 2008, MONTAGUE was required to provide a completed Executive Branch Personnel Public Financial Disclosure Report ("2008 Financial Disclosure Report") to the United States Office of

29

Government Ethics.  The Financial Disclosure Report contained a signature line next to a

"Certification" section that read:  "I CERTIFY that the statements I have made on this form and

all attached schedules are true, complete and correct to the best of my knowledge."

101.    The 2008 Financial Disclosure Report included Schedule C, Part II: Agreements

or Arrangements, which required reporting individuals to "Report your agreements or

arrangements for : . . . . (4) future employment."  The form further instructed the reporting

individual to "show any agreements or arrangements as of the date of filing."

102.    On or about May 12, 2009, in the Northern District of Ohio, Eastern Division,

Defendant knowingly and willfully falsified, concealed and covered up by any trick, scheme and

device a material fact on his 2008 Financial Disclosure Report, filed with the United States

Office of Government Ethics, in a matter within the jurisdiction of the executive branch of the

Government of the United States, that is; in response to Schedule C, Part II, Defendant failed to

report his future employment with Business 73, well knowing at the time that the response was

not true, complete and correct, because Defendant was party to a consulting agreement with

Business 73 that covered a twelve-month period from July 1, 2008 to July 1, 2009.

All in violation of Title 18, United States Code, Section 1001.

The Grand Jury further charges:

<u>COUNT 9</u>
(Restrictions on Former Officers, Employees and Elected Officials of the Executive and
Legislative Branches, 18 U.S.C. § 207(c))

103.    Paragraphs 1-5 and 78-86 of this Indictment are re-alleged and incorporated by

reference as if fully set forth herein.

104.    On or about February 3, 2010, MONTAGUE retired from the Cleveland VA.

105.    During the period in or around July 2010 through in or around September 2010, MONTAGUE worked as a consultant for Business 73.

106.    At all times relevant herein, VA Employee 1, was employed by the VA.  When MONTAGUE was employed by the Cleveland VA, he served as an informal mentor to VA Employee 1.

107.    The VAMC was unable to perform every test and procedure that patients required. When patients required a test or procedure that the VAMC could not offer, the VA contracted with local medical offices under a purchase care agreement.  The medical center performed the required service and billed the VA.

108.    From in or around July 2010, through in or around September 2010, the exact dates unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant WILLIAM D. MONTAGUE, who was an officer and employee of the executive branch of the United States, namely the United States Department of Veterans Affairs, and who was employed at a rate of pay and in a position set forth in Title 18, United States Code, Section 207(c)(2), within one year after the termination of his service and employment as such officer and employee, did knowingly and willfully make, with the intent to influence, a communication to and appearance before an officer and employee of the United States Department of Veterans Affairs, on behalf of Business 73 in connection with a matter on which MONTAGUE sought official action by an officer and employee of the United States Department of Veterans Affairs.

It was part of the offense that:

109.    In or around July 2010, MONTAGUE told VA Employee 1 that MONTAGUE

31

was working on a project with a non-profit organization and asked for a list of all medical offices that performed purchase care work for the VA.

110.    On or about July 6, 2010 at approximately 9:39 a.m., in response to MONTAGUE's request, VA Employee 1 sent MONTAGUE an email attaching two VA documents, "Medical Care.xlsx" and "Nursing Homes and Home Care.xls."

111.    On or about July 6, 2010 at approximately 1:37 p.m., in response to MONTAGUE's request, VA Employee 1 sent MONTAGUE an email stating attaching a VA documents, "Greater Cleveland Vendors.xls." The email stated, in part, "Here is the 'master' list for Greater Cleveland.  We spent a good amount of time trying to clean it up and make it useable. Hopefully there is good information you can use from the list."

112.    On or about July 8, 2010, MONTAGUE invoiced Business 73 for $5,000, for "Research and identify all quality clinical providers by category in NE Ohio and identify all providers used by a federal system in Cuyahoga County."

113.    In or around August 2010, MONTAGUE asked VA Employee 1 for the Cleveland VA Fee Schedule for medical procedures.

114.    On or about August 5, 2010, in response to MONTAGUE's request, VA Employee 1 sent an email to MONTAGUE attaching the following VA documents:  "Cleveland Local VA Fee Schedule FY 2010.xlsx," "Cleveland Local VA Fee Schedule 2008.xlsx," and Cleveland Local VA Fee Schedule FY 2009.xlsx."

115.    In or around September 2010, MONTAGUE asked VA Employee 1 for information about the most common out-patient medical procedures requested and billed by the Cleveland VA.

116. On or about September 3, 2010, MONTAGUE received a $5,000 check from Business 73.

117. On or about September 30, 2010, in response to MONTAGUE's request, VA Employee 1 sent an email to Montague providing VA data and documents, including an attachment entitled, "Top 25 CPTs and DRGs .xls."

All in violation of Title 18, United States Code, Section 207(c).

### General Allegations Related to MONTAGUE and Business 68

118. At all times relevant herein, Business 68 was a publically traded company with multiple divisions, including Federal Services, Energy/Construction, Oil/Gas and Construction/Design.

119. Business Executive or Employee 71 ("BE71") primarily worked in the Construction/Design division of Business 68.

120. In or around June 2009, while MONTAGUE was still employed by the Cleveland VA, MONTAGUE told BE71 he was considering retiring as the Cleveland VA Director and pursuing a career in private consulting. MONTAGUE asked BE71 if Business 68 would be interested in hiring him if he retired. At the time, Business 68 was attempting to advance its position with the VA for architectural, program management and other consulting services. Among other things, Business 68 wanted MONTAGUE to (1) advise on the VA's 5-year capital plan and strengthen Business 68's understanding of the project types and geographic regions where investments are planned to occur; (2) assist in arranging face-to-face introductory meetings with key decision makers at the national, regional, and local levels; and (3) provide insight on key selection criteria, in general and for specific pursuits.

121. In or around October 2009, Business 68 and MONTAGUE negotiated a consulting agreement pursuant to which MONTAGUE would receive approximately $2,500 per month.

122. On or about February 3, 2010, MONTAGUE retired from the Cleveland VA.

123. On or about February 4, 2010, Business 68 hired MONTAGUE as a consultant.

124. On or about February 5, 2010, MONTAGUE signed a Public Financial Disclosure Report.

125. On or about March 2, 2010, MONTAGUE sent MONTAGUE's task list to a Business 68 employee.

126. On or about March 11, 2010, Business 68 made its first $2,500 payment to MONTAGUE.

The Grand Jury further charges:

COUNT 10

(Falsify, Conceal, and Cover Up a Material Fact to the United States, 18 U.S.C. § 1001)

127. Paragraphs 1-5 and 118-126 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

128. As a Senior Executive Service employee at the VA in calendar year 2009 and into 2010, MONTAGUE was required to provide a completed Executive Branch Personnel Public Financial Disclosure Report ("2009 Financial Disclosure Report") to the United States Office of Government Ethics. The Financial Disclosure Report contained a signature line next to a "Certification" section that read: "I CERTIFY that the statements I have made on this form and all attached schedules are true, complete and correct to the best of my knowledge."

129.    The 2009 Financial Disclosure Report includes Schedule C, Part II: Agreements or Arrangements, which requires reporting individuals to "Report your agreements or arrangements for : .... (4) future employment."  The form further instructs the reporting individual to "show any agreements or arrangements as of the date of filing."  Schedule D, Part I: Positions Held Outside U.S. Government instructed "Report any position held during the applicable reporting period, whether compensated or not.  Positions include but are not limited to those of an officer, director, trustee, general partner, proprietor, representative, employee, or consultant of any corporation, firm, partnership, or other business enterprise or any non-profit organization or educational institution."

130.    On or about February 5, 2010, in the Northern District of Ohio, Eastern Division, Defendant knowingly and willfully falsified, concealed and covered up by any trick, scheme and device a material fact on his 2009 Financial Disclosure Report, filed with the United States Office of Government Ethics, in a matter within the jurisdiction of the executive branch of the Government of the United States, that is; (1) in response to Schedule C, Part II, Defendant failed to report his future employment with Business 68; and (2) in response to Schedule D, Part I, Defendant failed to report his position held with Business 68; well knowing at the time that both responses were not true, complete and correct.

All in violation of Title 18, United States Code, Section 1001.

35

The Grand Jury further charges:

<u>COUNT 11</u>

(Restrictions on Former Officers, Employees and Elected Officials of the Executive and
Legislative Branches, 18 U.S.C. § 207(c))

131.    Paragraphs 1-5 and 118-126 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

132.    From in or around February 2010, through in or around November 2010, the exact dates unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant WILLIAM D. MONTAGUE, who was an officer and employee of the executive branch of the United States, namely the United States Department of Veterans Affairs, and who was employed at a rate of pay and in a position set forth in Title 18, United States Code, Section 207(c)(2), within one year after the termination of his service and employment as such officer and employee, did knowingly and willfully make, with the intent to influence, a communication to and appearance before an officer and employee of the United States Department of Veterans Affairs, on behalf of Business 68 in connection with a matter on which MONTAGUE sought official action by an officer and employee of the United States Department of Veterans Affairs.

It was part of the offense that:

133.    In or around February 2010, MONTAGUE met with VA Employee 4 regarding Business 68.

134.    On or about February 26, 2010, MONTAGUE met with VA Employee 3 regarding Business 68.

36

135.    On or about March 27, 2010, MONTAGUE left a message for an NEBC employee and attempted to meet with an NEBC employee regarding Business 68, who at the time, was pursuing national VA contracts through the NEBC.

136.    On or about April 14, 2010, MONTAGUE reported to Business 68 that he met with "lots of VA people, got a briefing on where the construction program is going, obtained the information to predict which FY11 [ Fiscal Year 2011] projects will be funded and come close to predicting FY12 [Fiscal Year 2012]."

137.    On or about April 23, 2010, MONTAGUE met with an NEBC employee and obtained information for Business 68 related to the status and timing of VA decisions regarding "short-listing"  the contractors who bid energy IDIQ contracts, which contracts Business 68 was pursuing.

138.    On or about November 3, 2010, MONTAGUE asked VA Employee 3 to provide VA documents, which documents related to VA projects that Business 68 was pursuing with the VA, including documents related to logistics, construction funding, and the VA Facilities Management Transformation Initiative, which documents helped Business 68 remain efficient with time and money related to VA projects.

All in violation of Title 18, United States Code, Section 207(c).

**General Allegations Related to MONTAGUE and Business 69 & Business 70**

139.    At all times relevant herein, Business 69 was a service disabled, veteran owned business located in Cleveland, Ohio  Business Executive or Employee 72 ("BE72"), was a high level executive at Business 69.

37

140.     At all times relevant herein, Business 70 was a business located in Cleveland, Ohio.  Business Executive or Employee 73 ("BE73") was a high level executive at Business 70. Business 70 partnered with Business 69 on certain projects.

141.     At all times relevant herein, Business 71 was a construction company with which Business 69 sought to partner on certain projects. Business 71 was one of MONTAGUE's clients.

142.     On or about February 3, 2010, MONTAGUE retired from the Cleveland VA.

143.     In or around Fall 2010, MONTAGUE met with representatives from Business 69 to discuss MONTAGUE providing consulting services to Business 69.  Business 69 was interested in pursuing solar power projects and sought MONTAGUE's assistance pursuing VA solar power projects, including learning the VA's plans for solar power and identifying companies that specialized in solar panels.  Business 69 agreed to pay MONTAGUE for his services.  On or about December 7, 2010, Business 69 issued a check to WILLIAM MONTAGUE for $10,000, as payment for consulting services.

144.     At all times relevant herein, VA Employee 4 was a VA Employee.

The Grand Jury further charges:

## COUNT 12
(Restrictions on Former Officers, Employees and Elected Officials of the Executive and Legislative Branches, 18 U.S.C. § 207(c))

145.     Paragraphs 1-5 and 140-145 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

146.     On or about January 28, 2011, in the Northern District of Ohio, Eastern Division

and elsewhere, Defendant WILLIAM D. MONTAGUE, who was an officer and employee of the executive branch of the United States, namely the United States Department of Veterans Affairs, and who was employed at a rate of pay and in a position set forth in Title 18, United States Code, Section 207(c)(2), within one year after the termination of his service and employment as such officer and employee, did knowingly and willfully make, with the intent to influence, a communication to and appearance before an officer and employee of the United States Department of Veterans Affairs, on behalf of Business 69 and Business 70 in connection with a matter on which MONTAGUE sought official action by an officer and employee of the United States Department of Veterans Affairs, to wit: MONTAGUE asked VA Employee 4 to meet with Business 69 and Business 70, which MONTAGUE explained to VA Employee 4 would help Business 69 and Business 70 successfully complete their strategic goal of competing effectively for larger energy projects.

All in violation of Title 18, United States Code, Section 207(c).

### General Allegations Related to MONTAGUE's Dayton VA Employment

147.    On or about March 11, 2011, MONTAGUE began working as the Medical Center Director of the Dayton VAMC, a career Senior Executive Service position.  MONTAGUE had responsibility for executive level management of the Dayton facility.

148.    On or about March 15, 2011, MONTAGUE obtained training on the rules governing MONTAGUE working as a consultant while also working as the Dayton VA Director.

149.    VA Employee 5 and VA Employee 6 were VA employees who worked under MONTAGUE.

150.     VA Employee 12 was an attorney with the VA.

The Grand Jury further charges:

<u>COUNTS 13-17</u>

(Wire Fraud, 18 U.S.C. §§ 1343 and 2)

151.     Paragraphs 1-5, 9 and 148-151 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

<u>The Scheme</u>

152.     From in or around April 2011 through on or about November 10, 2011, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant WILLIAM D. MONTAGUE did knowingly devise and intend to devise a scheme and artifice to defraud the United States Department of Veterans Affairs and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, caused to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds.

It was part of the scheme that:

153.     In or around April 2011, MONTAGUE asked VA Employee 5 and VA Employee 6 to research alternative energy projects the VA was administering across the country.  VA Employee 5 and VA Employee 6 began collecting the data MONTAGUE requested, by among other means, contacting VA facilities across the country to gather information related to installation costs, energy savings value, energy sources used, and contact information for the VA contracting officials.  VA Employee 5 and VA Employee 6 used their official positions at the VA to obtain some of this information.  As VA Employee 5 and VA Employee 6 received

40

information from other VA employees, VA Employee 6 created a spreadsheet to summarize the information.

154.    In or around April 2011, MONTAGUE asked VA Employee 6 to research solar panel manufacturers.  VA Employee 6 identified solar panel companies and further vetted the companies through references.  VA Employee 6 used his official position at the VA to obtain some of this information.

155.    On or about April 12, 2011, MONTAGUE caused to be sent an email to VA Employee 12 related to an ethics opinion on MONTAGUE having private employment while also working as the Dayton VA Director.  MONTAGUE described his business, in part, as "I take public information, such as budget documents, SCIP plans, and other official documents and predict which will be funded.  I also provide consultive services for bids and teaming agreements."  MONTAGUE further stated, "I realize that I can do nothing involving the Dayton VAMC, I can never present my opinion as that of the Dayton VAMC Director, and I cannot provide any service on duty time or utilize government equipment."

156.    On or about April 13, 2011, MONTAGUE received an email from VA Employee 12 containing draft ethics guidance, which included the following:  "As the Director has pointed out, his business activities must be kept out of the VAMC and not involve use of VA office equipment or supplies. . . . Further, his business activities may not involve the use of non-public information."

157.    On or about April 18, 2011, VA Employee 6 sent an email to VA Employee 5 attaching a spreadsheet containing the data he had obtained related to energy projects.

41

Thereafter, VA Employee 5 forwarded the spreadsheet entitled "Preferred Energy Source.xls," to MONTAGUE.

158.    On or about April 20, 2011, MONTAGUE asked VA Employee 7 to scan a document and send it via e-mail to VA Employee 5.  VA Employee 7 did as instructed and sent VA Employee 5 an e-mail with the attachment titled "VA Construction Program0001.pdf."

159.    Thereafter, on or about April 20, 2011 at approximately 4:37 p.m., VA Employee 5 sent an e-mail to MONTAGUE's personal (non-VA) e-mail account, writing, "Here is the information that you requested," and attaching documents "VA Construction Program0001.pdf" and "Preferred Energy Source.xls."

160.    On or about May 8, 2011, MONTAGUE sent an email to a BE74 (a Business 68 employee), stating, "As promised," and attaching the documents "VA Construction Program0001.pdf" and "Preferred Energy Source.xls."

161.    On or about May 9, 2011, VA Employee 6 sent an email from VA Employee 6's VA email account to MONTAGUE's VA email account, updating MONTAGUE on the solar panel project.

162.    On or about May 22, 2011, MONTAGUE sent an email from his "sbcglobal.net" email account to representatives of Business 66, Business 69, and Business 70, attaching the spreadsheet that VA Employee 6 and VA Employee 5 had created.

163.    On or about June 16, 2011, VA Employee 6 sent an email from VA Employee 6's VA email account to MONTAGUE's VA email account, attaching an internet link to a solar power company.

164. On or about June 16, 2011, MONTAGUE forwarded VA Employee 6's email from MONTAGUE's VA email account to MONTAGUE's "me.com" email account. Shortly thereafter, MONTAGUE forwarded that email to BE72, and added, "My engineers still rate [a named company] as the best and most favored by the government."

165. On or about November 10, 2011, Business 69 issued a check to WILLIAM MONTAGUE for $7,500.

166. MONTAGUE did not disclose to VA Employee 6 or to VA Employee 5 that he was working as a consultant for companies pursuing energy contracts with the VA. MONTAGUE did not tell VA Employee 6 or VA Employee 5 that he (MONTAGUE) provided the data they collected to MONTAGUE's clients.

167. VA Employee 6 and VA Employee 5 performed these tasks during their regularly scheduled work day, using VA equipment and resources. VA Employee 6 and VA Employee 5 received their regular VA salary for the work performed at MONTAGUE's request.

168. On or about the dates listed below, in the Northern District of Ohio and elsewhere, MONTAGUE, for the purpose of executing the above-described scheme and artifice, caused to be transmitted by means of wire communication, in interstate commerce, writings, signs, signals, pictures, and sounds, in the Northern District of Ohio, including the following, each constituting a separate Count:

| Count | Date | Description |
|-------|------|-------------|

43

| 13 | April 20, 2011 | Email from VA Employee 5's VA e-mail account to MONTAGUE's "me.com" e-mail account, stating, "Here is the information that you requested," and attaching the VA Construction Program0001.pdf from VA Employee 7 and another copy of the "Preferred Energy Source.xls" spreadsheet. |
| 14 | May 8, 2011 | Email from MONTAGUE's "sbcglobal.net" email account to BE74, stating, "As promised," and attaching the "VA Construction Program0001.pdf" and the "Preferred Energy Source.xls" spreadsheet. |
| 15 | May 22, 2011 | Email from MONTAGUE's "sbcglobal.net" email account to BE72, attaching the spreadsheet that VA Employee 6 and VA Employee 5 created. |
| 16 | June 16, 2011 | Email from MONTAGUE's "va.gov" email account to MONTAGUE's "me.com" email account, subject matter "FW:Solar Power Company Link." |
| 17 | June 16, 2011 | Email from MONTAGUE's "me.com" account to BE72, subject matter "FW: Solar Power Company Link," and adding "My engineers still rate [company] as the best and most favored by the government." |

All in violation of Title 18, United States Code, Sections 1343 and 2.

The Grand Jury further charges:

COUNTS 18-35

(Mail Fraud, 18 U.S.C. §§ 1341 and 2)

169.    Paragraphs 1-5 and 9 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

At all times relevant herein:

170.    Business 66 was an electrical and technology company located in Bedford Hts., Ohio.

171.    Business 68 was a publically traded company with multiple divisions, including Federal Services, Energy/Construction, Oil/Gas and Construction/Design.

44

172.    Business 69 was a service disabled, veteran owned business located in Cleveland, Ohio.

173.    Business 70 was a minority owned business located in Cleveland, Ohio.  Business Executive or Employee 73 ("BE73") was a high level executive at Business 70.  Business 70 partnered with Business 69 on certain projects.

174.    Business 73 was non-profit organization that provided a variety of human service programs to help people in need, including providing social services to veterans.  Business 73 had branches around the United States, including in Cleveland, Ohio, and was headquartered in Virginia.

<u>The Scheme</u>

175.    From in or around 2007 through on or about March 31, 2012, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant WILLIAM D. MONTAGUE did knowingly devise and intend to devise a scheme and artifice to defraud certain potential VA Contractors and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, caused matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, in accordance with the directions thereon.

It was part of the scheme that:

176.    MONTAGUE used his position as a current and former high-ranking official with

45

the VA to obtain VA documents, VA employee insights, meetings with VA officials, and other VA information (collectively "VA inside information") to benefit MONTAGUE's consulting clients.

177.    The clients who MONTAGUE benefitted and sought to benefit by soliciting and receiving VA insider information included Business 66, Business 68, Business 69, Business 70, and Business 73.

178.    By obtaining the VA inside information, MONTAGUE's consulting clients obtained and sought to obtain an advantage over other potential VA contractors.

179.    MONTAGUE, both directly and through House of Montague, obtained fees from clients who sought and obtained VA documents, VA employee insights and other VA information from MONTAGUE.

180.    MONTAGUE deceived some VA employees by giving them false, misleading and materially incomplete reasons for MONTAGUE requesting VA inside information.

181.    On or about the dates listed below, in the Northern District of Ohio and elsewhere, MONTAGUE, for the purpose of executing the above-described scheme and artifice, caused to be caused matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, in accordance with the directions thereon, each constituting a separate Count:

| Count | Date | Description |
|-------|------|-------------|
| 18 | 3/11/10 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 19 | 4/8/10 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 20 | 5/27/10 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 21 | 7/29/10 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 22 | 8/5/10 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 23 | 9/3/10 | $5,000 payment from VOA to MONTAGUE sent from Virginia to Brecksville, Ohio. |
| 24 | 9/30/10 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 25 | 10/14/10 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 26 | 11/4/10 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 27 | 12/16/10 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 28 | 1/20/11 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 29 | 3/31/11 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 30 | 5/19/11 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 31 | 6/16/11 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 32 | 7/7/11 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |

| 33 | 9/29/11 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 34 | 10/27/11 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |
| 35 | 12/22/11 | $2,500 payment from URS to MONTAGUE sent from Texas to Brecksville, Ohio. |

All in violation of Title 18, United States Code, Sections 1341 and 2.

The Grand Jury further charges:

COUNT 36

(Money Laundering, 18 U.S.C. § 1957)

182.     On or about August 14, 2010, in the Northern District of Ohio, Eastern Division,

defendant WILLIAM D. MONTAGUE did knowingly engage and attempt to engage in a

monetary transaction, by, through and to a financial institution, affecting interstate and foreign

commerce, in a criminally derived property of a value greater than $10,000, that is, issuing check

number 1014 from the House of Montague Wealth Management and Consulting bank account,

US Bank Account No. XXX9704, payable to Third Federal, in the amount of $12,400, as

payment on a mortgage for a residence on Province Lane, Brecksville, Ohio, such property

having been derived from a specified unlawful activity, that is proceeds of Counts 1 and 11-35 of

this Indictment, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349.

All in violation of Title 18, United States Code, Section 1957.

**FORFEITURE: COUNT 1**

183.     The allegations of Count 1 are hereby re-alleged and incorporated herein by

48

reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c). As a result of the foregoing offense, defendant WILLIAM D. MONTAGUE

shall forfeit to the United States all property, real and personal, which constitutes, or is derived

from, proceeds traceable to the commission of Count 1; including, but not limited to, the

following:

     a.)     MONEY JUDGMENT: defendant WILLIAM D. MONTAGUE shall forfeit

property, including, but not limited to, a sum of money equal to the proceeds of Count 1.

### FORFEITURE: COUNT 2

     1.     The allegations of Count 2 are hereby re-alleged and incorporated herein by

reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c). As a result of the foregoing offense, defendant WILLIAM D. MONTAGUE

shall forfeit to the United States all property, real and personal, which constitutes, or is derived

from, proceeds traceable to the commission of Count 2; including, but not limited to, the

following:

     a.)     MONEY JUDGMENT: defendant WILLIAM D. MONTAGUE shall forfeit

property, including, but not limited to, a sum of money equal to the proceeds of Count 2.

### FORFEITURE: COUNTS 13-17

     184.     The allegations of Counts 13-17 are hereby re-alleged and incorporated herein by

reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c). As a result of the foregoing offenses, defendant WILLIAM D. MONTAGUE

shall forfeit to the United States all property, real and personal, which constitutes, or is derived

from, proceeds traceable to the commission of Counts 13-17; including, but not limited to, the following:

a.)     MONEY JUDGMENT: defendant WILLIAM D. MONTAGUE shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Counts 13-17.

### FORFEITURE: COUNTS 18-35

185.    The allegations of Counts 18-35 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  As a result of the foregoing offenses, defendant WILLIAM D. MONTAGUE shall forfeit to the United States all property, real and personal, which constitutes, or is derived from, proceeds traceable to the commission of Counts 18-35; including, but not limited to, the following:

a.)     9252 Province Lane, Brecksville, Cuyahoga County, Ohio (Permanent Parcel Number 602-12-068); more particularly: proceeds totaling $26,151.58, more or less, were used to make payments on the property.

b.)     MONEY JUDGMENT: defendant WILLIAM D. MONTAGUE shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Counts 18-35.

### FORFEITURE: COUNT 36

186.    The allegations of Count 36 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(1).  As a result of the foregoing offense, defendant WILLIAM D. MONTAGUE shall forfeit to the United States all property, real and personal, involved in such offense, and all property traceable to such property;

including, but not limited to, the following:

a.) 9252 Province Lane, Brecksville, Cuyahoga County, Ohio (Permanent Parcel Number 602-12-068).

b.) MONEY JUDGMENT: defendant WILLIAM D. MONTAGUE shall forfeit property, including, but not limited to, a sum of money equal to the value of all property involved in Count 38.

## SUBSTITUTE PROPERTY

187. In the event that any property subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) and/or 18 U.S.C. § 982(a)(1), as a result of any act or omission of the defendant:

- a.) cannot be located upon exercise of due diligence;
- b.) has been transferred or sold to, or deposited with a third party;
- c.) has been placed beyond the jurisdiction of this Court;
- d.) has been substantially diminished in value; or,
- e.) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) [as incorporated by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)(1)], to seek forfeiture of any other property of the defendant, up to an amount equivalent to the value of the forfeitable property described above.

TRUE BILL

Original document -- Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.

51